PATTERSON, Judge.
Appellant, William Edgar Hawkins, was found guilty by a Mobile County Circuit Court of possession of burglary tools, in violation of § 13A-7-8, Code of Alabama 1975. Appellant was sentenced, under the Habitual Felony Offender Act, to three years in the State penitentiary.
This appeal rests on the sole contention that the trial court erred in denying appellant’s motion to suppress the evidence of the burglary tools which had been seized from the vehicle appellant was driving. Appellant argues that the stop of the vehicle and the subsequent search were not based on probable cause.
The facts presented at the hearing on the motion to suppress are as follows: Bernard Ryan was a former F.B.I. agent in Mobile, Alabama, and, at the time of the incident, was a prosecutor for Cook County, Illinois. In October 1986, while he was a special agent for the F.B.I. in Mobile, he participated in a joint investigation with the Mobile Police Department into the interstate transportation of stolen property by members of the “McKinney gang.” Information about the “McKinney gang” was gathered by the St. Louis, Missouri, F.B.I. office as a result of a sting operation and an investigation and was passed on to the Mobile F.B.I. office. This information linked members of the “McKinney gang” to many burglaries across the southern United States. The Mobile F.B.I. office was also informed that two Mobile residents, Tommy Lynn House and his wife, Cloyce House, were part of this burglary ring. Based upon information obtained from informants throughout 1987, Ryan suspected that appellant was also a member of the burglary ring.
Sometime in February 1988, but prior to February 8, Ryan received additional information, from two confidential sources, that appellant was to travel to Mobile on either February 10 or 11, 1988, to meet with Cloyce House and visit with Tommy Lynn House.
Ryan subsequently learned that appellant had visited Tommy Lynn House in the Mobile County jail on October 25, 1987, as evidenced by appellant’s signature and address on a jail visitor's form. After learning this, Ryan contacted one of his two sources and received information that appellant and Cloyce House were planning a burglary spree in Mobile. On February 8, 1988, Ryan again received information, from one of the two informants, that appellant was definitely coming to Mobile on February 12 and 13, 1988, the weekend before Mardi Gras, to commit burglaries in the wealthy areas of Mobile. Ryan had known these two sources since October 1987.
Ryan was also alerted as to the modus operandi of the “McKinney gang,” which consisted of the following: The group uses two or more people to commit burglaries. When they arrive in a city, they check into a hotel adjacent to the area they plan to burglarize. They normally go to the library to find the names of prominent people in the city and then telephone or “case” their residences. The burglaries are usually carried out during holidays or during some festive event. In the course of carrying out the burglaries, the group uses po *1195 lice scanners, walkie-talkies, gloves, a circular pick, and key pick decoders. A call is usually placed to the residence from a telephone booth, and the phone is allowed to ring until one of the burglars enters the residence unlawfully, picks up the telephone, and announces he is inside the house. Only jewelry, silverware, and items of gold are taken.
Based on this above information, the F.B.I. and the Mobile Police Department set up a surveillance of the Houses’ residence at 2723 Clubhouse Road. On the morning of February 12, 1988, Ryan saw a brown Buick with an Illinois dealer’s tag parked at the Houses’ residence and saw a white male in his forties walk out of the residence with Cloyce House, get into her 1977 Ford Thunderbird with her, and then leave in that vehicle. Ryan identified the appellant as the man he saw leaving with Cloyce House.
At approximately 5:30 p.m., on February 12, 1988, Ryan, several F.B.I. agents, and several Mobile Police Department investigators set up surveillance in the area of the Houses’ residence. At approximately 6:25 p.m., the two vehicles left the residence. The Thunderbird was occupied by Mrs. House and her mother, Martha Martin; and the brown Buick was driven by appellant. The surveillance team followed the two cars along Dauphin Island Parkway to interstate highway I — 10 and then to 1-65 north. Both cars were driven below the speed limit and below the speed of the traffic, except that occasionally the drivers would speed up and then slow down. They proceeded westbound on Airport Boulevard, until they stopped in the parking lot of the Caligula nightclub at approximately 6:45 p.m.
The surveillance team following the cars could not go into the parking lot, which was a dead end, but sent a person to check. This person reported back that Cloyce House’s Thunderbird was parked, but unoccupied. Two men were placed to maintain surveillance on the Thunderbird. The rest of the team attempted to locate the brown Buick, which had disappeared from sight.
The Buick was spotted, 15 or 20 minutes later, traveling north on Hillwood Avenue from Wimbleton Drive. Martha Martin was driving and appeared to be the only occupant in the car at the time. The surveillance team continued watching the car, which traveled in a circular pattern, until it was lost again. It was not found again until 9:15 p.m., parked at the House residence. The neighborhood, where Martha Martin had been driving, consists of wealthy residences and is the same area where two previous burglaries had been committed for which Cloyce House and her husband had been convicted in 1986.
From 9:15 p.m., when the brown Buick car was spotted back at the House residence, fixed surveillance was maintained on the Buick, and surveillance also continued on House’s Thunderbird. At approximately 11:45 p.m., some five hours after the Thunderbird was first parked in the Caligula parking lot, an F.B.I. agent and a Mobile police officer observed an unidentified man retrieve an article from the right wheel of the Thunderbird, enter the Thunderbird, and drive the vehicle from the parking lot. There appeared to be no one else in the vehicle at this time. The surveillance officers did not identify appellant as the driver, at this time. The driver drove the vehicle northbound on University Drive, then went west on Sunset Drive, stopped, then turned back and returned to University Drive with a second occupant in view. He continued on University Drive to the intersection of University and Airport Boulevard. During this latter surveillance Ryan apparently joined the surveillance team, and he observed appellant driving the vehicle and saw Cloyce House in the car. Appellant drove through an Arby’s restaurant drive-up, then onto Airport Boulevard, to 1-65 southbound to I — 10, and westbound to Tillman’s Corner. Appellant then exited the interstate highway, got back on the interstate immediately, and returned to Dauphin Island Parkway and towards Clubhouse Road.
At the intersection of Dauphin Island Parkway and Clubhouse Road, the Buick was stopped and appellant and Cloyce House were asked to step out of the car. *1196 A police scanner, which was operating, was in plain view on the front seat of the vehicle. On the floor of the front seat of the vehicle was a camouflage-colored bag, which was subsequently opened and found to contain a circular lock pick,'three small hand-held flashlights approximately three inches long, a pry bar, a pair of tin snips, a pair of garden pruners, a pair of channel locks, two large flat-headed screwdrivers, a small punch, spare batteries, B.B. shot, one carbon dioxide container, two pairs of cotton gloves, two dark jump suits, and one ski mask. All of these items were seized by the Mobile police officers, and appellant was arrested.
Ryan testified that the vehicle was stopped because the police had probable cause based on the following: his information from reliable sources which had been corroborated by the surveillance; the fact that appellant and Cloyce House travelled to the same location using the same known modus operandi as that used by the “McKinney gang”; and the fact that one of the two occupants of the car had previously been convicted of a burglary. The decision to stop the vehicle was a collective decision by Sergeant Sweatt and his supervisor, Lieutenant Stewart, both with the Criminal Investigation Division of the Mobile Police Department. Sweatt also testified that there was probable cause to believe that appellant and Cloyce House had committed a burglary and that this was why the car was stopped and searched without a warrant and why appellant and House were arrested without a warrant. The record indicates that there was no evidence that a burglary had, in fact, occurred or that appellant had been seen doing anything other than driving a car in a very peculiar fashion. Appellant and Cloyce House were not subsequently charged with burglary, but rather with possession of burglary tools.
As a general rule, warrantless searches are per se unreasonable as being violative of the Fourth Amendment. Youtz v. State, 494 So.2d 189 (Ala.Cr.App.1986). However, when the circumstances of a case give' rise to one of the well-documented exceptions to the general rule, a warrant-less search may be acceptable. Dale v. State, 466 So.2d 196 (Ala.Cr.App.1985). One of these exceptions arises when exigent circumstances exist, along with adequate probable cause. This particular exception “authorizes the warrantless search of a vehicle when the police initially have probable cause to believe that the vehicle contains contraband or evidence of a crime and if exigent circumstances exist.” Oliver v. State, 479 So.2d 1385, 1388 (Ala.Cr.App.1985). “Exigent circumstances exist whenever an object to be searched is mobile or moveable, such as an automobile.” Spencer v. Town of Gordo, 389 So.2d 182, 184 (Ala.Cr.App.1980) (citations omitted).
“Beginning with the decision in Carroll v. United States, 267 U.S. 132 [45 S.Ct. 280, 69 L.Ed. 543] (1925), the Supreme Court has defined an exception to the Fourth Amendment for automobile searches. The legality of a warrantless automobile search is based on the existence of probable cause to believe that the automobile is carrying contraband subject to forfeiture under the law, and the difficulties of securing a moveable vehicle while a warrant is obtained. It is the suspected contraband on which the analysis focuses and for which this type of warrantless search and seizure is allowed. [citation omitted.]”
United States v. Thomas, 536 F.Supp. 736, 742 (M.D.Ala.1982). The examination of probable cause requires us first to look at the case of Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), where the Supreme Court abandoned the “two-pronged test” established in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and readopted the traditional “totality of circumstances” approach to probable cause. See also Dale v. State, 466 So.2d at 199; Walker v. State, 462 So.2d 794 (Ala.Cr.App.1984); Sawyer v. State, 456 So.2d 114 (Ala.Cr.App.1984). The test requires this court to look at the facts and judge those facts on the basis of whether a “reasonably prudent man of the officer’s experience and training, looking at the ‘totality of the circumstances’ and the *1197 inferences therefrom, would conclude that there is probable cause to believe that the vehicle or the individuals are involved in violating the law.” United States v. Thomas, 536 P.Supp. at 743 (quoting United States v. Ballard, 600 F.2d 1115, 1119 (5th Cir.1979)). See also Gord v. State, 475 So.2d 900, 903 (Ala.Cr.App.1985).
Sergeant Sweatt and Lieutenant Stewart were given information by Ryan, a law enforcement officer and former F.B.I. agent with whom they had worked before. Ryan relayed to them that his informants had been reliable in the past. Although Ryan did not give any facts indicating how his informants had obtained their information, confirmation of the information was gained by surveillance, whereby the officers observed such things as appellant’s association with a vehicle with an Illinois tag, his presence in Mobile at the time given by the informers, his visit to the county jail to visit a known member of the “McKinney gang,” the erratic driving pattern of appellant, which conformed with the modus operandi of the “McKinney gang,” and the presence of a convicted burglar in appellant’s car. Moreover, the Buick most driven by appellant was observed being driven by Martin in an area where burglaries had previously been committed within the known modus operandi of the “McKinney gang.”
Even if one of the above stated sources of information, alone, would have been inadequate to supply sufficient probable cause to stop the vehicle and conduct a warrantless search, when they are taken in totality there can be no question that probable cause existed. We find that a reasonably prudent person of the officers’ experience and training, knowing what the officers knew, would have justifiably believed that a crime had been or was being committed, and that the vehicle contained evidence of crime.
Since there was probable cause to believe that a burglary had been or was being committed and that the Thunderbird contained some evidence of crime, i.e., burglary tools or stolen articles, there was probable cause, coupled with exigent circumstances, to justify a stop of the vehicle and a warrantless search.
Moreover, the search of the camouflage-colored bag was clearly justified.
“If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.”
Oliver v. State, 479 So.2d at 1388-89 (quoting United States v. Ross, 456 U.S. 798, 823-25, 102 S.Ct. 2157, 2172-73, 72 L.Ed.2d 572 (1982)).
The trial court correctly denied the motion to suppress; therefore, this case is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.